**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**DONALD H. AYERS,**

      **Petitioner,**             **2:13-cv-892**
                                   **2:06-cr-129(3)**
  **v.**                           **Judge Marbley**
                                   **Magistrate Judge King**

**UNITED STATES OF AMERICA,**

      **Respondent.**

**<u>REPORT AND RECOMMENDATION</u>**

Petitioner Donald H. Ayers, a federal prisoner, brings this action to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. This matter is before the Court on the *Motion to Vacate*, ECF No. 1252, *Amendment Number One*, ECF No. 1281, and *Amendment Number Two*, ECF No. 1315; Respondent's *Answer and Motion to Dismiss,* ECF No. 1282; Petitioner's *Reply,* ECF No. 1288, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that Respondent's *Answer and Motion to Dismiss*, ECF No. 1282, be **GRANTED** and that this action be **DISMISSED.**

**<u>FACTS AND PROCEDURAL HISTORY</u>**

The United States Court of Appeals for the Sixth Circuit summarized the facts and procedural history of the case in relevant part as follows:

> National Century Financial Enterprises (NCFE) defrauded its investors of more than $2.4 billion. The question here is whether Donald Ayers participated in that fraud. A jury concluded that he did, convicting him of securities fraud, conspiracy to commit securities fraud and wire fraud, and conspiracy to commit money laundering. Ayers now appeals, primarily challenging the sufficiency of the evidence supporting each conviction. We reject his arguments on the fraud convictions, but agree that the government did not prove a conspiracy to commit money laundering. We therefore affirm Ayers's fraud convictions, reverse the money-laundering one, and remand the case for resentencing.

The facts surrounding NCFE's collapse are described in greater detail in *United States v. Faulkenberry*, 614 F.3d 573 (6th Cir. 2010), an appeal by one of Ayers's co-defendants. The facts below suffice for Ayers's arguments.

NCFE's business was to purchase, at a discount, the accounts receivable of healthcare providers. These transactions benefitted providers by affording them immediate cash flow; and in theory, they generated profits for NCFE based on the discounted purchase price.

Of course, NCFE itself needed money to purchase the receivables, so it sold bonds to investors. Technically, two of NCFE's subsidiaries, NPF VI and NPF XII, issued the bonds. But NCFE fully controlled those subsidiaries, and NCFE remained responsible for marketing the bonds. Most of that marketing occurred through monthly presentations or through the Private Placement Memorandum (PPM), which was a document sent to investors describing the bonds.

When marketing the bonds, NCFE executives made specific representations about certain investor protections, four of which are relevant here. First, NCFE promised investors that their monies would be used only to purchase "eligible receivables." A receivable was eligible only if it met certain criteria demonstrating a low risk of default. Second, the purchased receivables would serve as collateral for the amounts that NCFE owed its bondholders. Thus, each time NCFE sent investors' monies to a provider, the investors obtained roughly equivalent collateral in the form of purchased receivables.

Third, NCFE told investors that it would maintain reserve accounts equal to 17% of the "outstanding Purchased Receivables." If any of the purchased receivables were not paid, NCFE could then cover itself by withdrawing the unpaid amount from the reserve accounts. And fourth, NCFE established Trustee oversight for the accounts containing investors' funds. The Trustees were responsible for ensuring that the reserve accounts were adequately funded, and for distributing monthly investor reports that NCFE created. NCFE raised billions of dollars from investors.

The record makes clear that those representations were false. NCFE executives repeatedly lied to investors from approximately 1995 until 2002, when approximately NCFE ceased operations. The deception centered on the practice of "advancing." Contrary to what it told investors, NCFE routinely wired funds to healthcare providers without obtaining any receivables, much less eligible ones, in return. These advances—consisting of investor monies—were the equivalent of unsecured loans. Nevertheless, NCFE sent many of the advances to providers on the verge of bankruptcy, sometimes even to providers in bankruptcy.

Unsurprisingly, the providers consistently failed to re-pay NCFE; and over time, the advances rendered NCFE's investors increasingly under-collateralized. They did so on a massive scale: by August 2002, eight providers each owed NCFE over

$100 million, one of them as much as $600 million, little of which was secured by eligible receivables.

NCFE went to extraordinary lengths to conceal these aspects of its business. Under the governing documents for investor bonds, the Trustees could wire funds to providers only to the extent that NCFE documented that it was obtaining eligible receivables in return. To evade this limitation, NCFE submitted a phony Receivables Purchase Report to the Trustees for every advance. NCFE also hid the advances, and the losses caused by them, from investors. Sherry Gibson, NCFE's "Director of Compliance," testified at trial that the monthly investor reports "would be manipulated in any way necessary in order to make compliance[.]" Indeed, she testified that every report from 1995 until NCFE's collapse in 2002 was falsified.

NCFE also concealed shortages in NPF VI's and XII's reserve accounts, albeit in a different way. Each month, the Trustees were obligated to "test" the sufficiency of the accounts' balances. NCFE arranged for the NPF VI and XII testing to be conducted on different days, however, and then shifted funds between each account as needed to make each appear to have sufficient funds on its testing day. That shifting of funds—first to one NPF entity, then back to the other—occurred every month from approximately 2000 onward, frequently involving sums over $100 million. By 2002, NCFE would transfer the entire balance from one entity to the other.

Finally, on September 30, 2002, a Trustee refused to shift funds between the accounts. That refusal triggered a cascade of events that revealed the full extent of NCFE's fraud to its investors. NCFE declared bankruptcy in November 2002, resulting in investor losses of approximately $2.4 billion.

That NCFE defrauded its investors does not necessarily mean that all of its executives participated in the fraud. The person before us in this appeal is Donald Ayers. He was one of NCFE's three original founders, and considered a "principal." While at NCFE, he served as Chief Operating Officer and as Vice Chairman of the Board of Directors.

After NCFE's collapse, the government indicted Ayers on six counts of securities fraud, one count of conspiracy to commit securities fraud and wire fraud, and one count of conspiracy to commit money laundering. The government tried him with four co-defendants. After a six-week trial, the jury convicted all defendants on all counts. The district court sentenced Ayers to fifteen years' imprisonment: five years on each of the fraud-related counts, and fifteen years on the conspiracy to commit money-laundering count, with all sentences running concurrently. The court also ordered Ayers to pay restitution in the amount of $2.4 billion.

3

*United States v. Ayers*, 386 Fed.Appx. 558, 560-562, unpublished, 2010 WL 2925939 (6ᵗʰ Cir. July 28, 2010).  The Sixth Circuit overturned Petitioner's conviction for conspiracy to commit money laundering, but otherwise affirmed this Court's *Judgment*, and remanded the case for re-sentencing.  *Id.*  On December 23, 2010, the District Court re-imposed an aggregate term of 180 months' imprisonment.  ECF No. 1100.  On March 15, 2012, the United States Court of Appeals for the Sixth Circuit affirmed that *Judgment.*  ECF No. 1146.  On June 29, 2012, the United States Supreme Court denied Petitioner's petition for a writ of *certiorari.*  ECF No. 1208.

On September 9, 2013, Petitioner filed the *pro se Motion to Vacate* pursuant to 28 U.S.C. § 2255.  He asserts that he was denied the effective assistance of counsel because his attorney failed to disclose a plea opportunity, failed to present an adequate defense based on good faith reliance, failed to investigate the defense expert prior to calling him as a defense witness, failed to investigate the government's loss figures, and failed to "preserve new rule."  Petitioner also asserts that he was denied a fair trial because of prosecutorial misconduct and alleges that his sentence was unconstitutionally imposed.  Respondent contends that Petitioner's claims are procedurally defaulted and without merit.

## STANDARD OF REVIEW

To obtain relief under 28 U.S.C. § 2255, a petitioner must establish the denial of a substantive right or defect in the trial that is inconsistent with the rudimentary demands of fair procedure.  *United States v. Timmreck*, 441 U.S. 780 (1979); *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (*per curiam*).  Relief under 28 U.S.C. § 2255 is available when a federal sentence was imposed in violation of the Constitution or laws of the United States, when the trial court lacked jurisdiction, or when the sentence was in excess of the maximum sentence allowed by law or was "otherwise subject to collateral attack."  *United States v. Jalili*, 925 F.2d 889, 893

(6th Cir. 1991). Even in the absence of constitutional error, relief is available if "the claimed error was a 'fundamental defect which inherently results in a complete miscarriage of justice,' " *Davis v. United States*, 417 U.S. 333, 346 (1974)(quoting *Hill v. United States*, 368 U.S. 424, 428-29 (1962)); *see also Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2006). However, non-constitutional claims not raised at trial or on direct appeal are waived for collateral review except where the errors amount to something akin to a denial of due process. Mistakes in the application of the sentencing guidelines will rarely, if ever, warrant relief from the consequences of waiver. *Grant v. United States,* 72 F.3d 503, 506 (6th Cir. 1996).

It is well-established that a motion to vacate under § 2255 "is not a substitute for a direct appeal." *Ray v. United States*, 721 F.3d 758, 761 (6th Cir. 2013) (citing *United States v. Frady*, 456 U.S. 152, 167-68 (1982)). Accordingly, claims that could have been raised on direct appeal, but were not, will not be entertained in a motion to vacate under § 2255 unless the petitioner shows: (1) cause and actual prejudice to excuse his failure to raise the claims on direct appeal or (2) that he is "actually innocent" of the crime. *Id*. at 761 (citing *Bousley v. United States*, 523 U.S. 614, 622 (1998)). "To obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *Frady,* 456 U.S. at 166.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner alleges that his trial counsel were ineffective in a number of respects. The Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). In order to establish the denial of the effective assistance of counsel, a defendant must demonstrate that his attorney performed in a constitutionally deficient manner. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Scrutiny of defense counsel's performance must be "highly deferential." *Id*. at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id* .

The defendant also must show that he was thereby prejudiced. This requires a showing that his attorney's errors were so serious as to deprive him of a fair trial*, i.e.,* a trial whose result is reliable. *Id*. In order to establish the second prong of the *Strickland* test, *i.e.*, prejudice, a petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Because a claim of ineffective assistance of counsel requires proof of both prongs of the *Strickland* test, should a court determine that a petitioner has failed to satisfy one prong, that court need not consider the other. *Id*. at 697.

**<u>Plea Negotiations</u>**

Petitioner alleges that his counsel performed in a constitutionally ineffective manner during the plea negotiation phase. A criminal defendant is entitled to the effective assistance of counsel during the plea negotiation process. *Lafler v. Cooper*, -- U.S. --, 132 S.Ct. 1376 (2012).

> Having to stand trial, not choosing to waive it, is the prejudice alleged. In these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e*., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Id*. at 1385. The United States Court of Appeals for the Sixth Circuit has described the obligations of defense counsel as it relates to advice during the plea negotiation stage:

> A criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available

*Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003) (citing *United States v. Day*, 969 F.2d 39, 43 (3d Cir.1992)).

"[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Missouri v. Frye*, -- U.S. --, 132 S.Ct. 1399, 1408 (2012). The failure to do so prior to the expiration of the terms of the offer is constitutionally unreasonable. *Id.* However, a petitioner who later complains of a lost plea bargain must also establish prejudice.

> To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it. . . .

*Id*. at 1409. In this regard, a petitioner must show that, "if the prosecution had the discretion to cancel [the plea offer], or if the trial court had the discretion to refuse to accept it, there is a reasonable probability neither the prosecution nor the trial court would have prevented the offer from being accepted or implemented." *Id*. at 1410.

An attorney's failure to insist that his client accept a plea offer in light of overwhelming evidence of guilt does not amount to constitutionally ineffective assistance.

> The decision to plead guilty - first, last, and always - rests with the defendant, not his lawyer. Although the attorney may provide an opinion on the strength of the government's case, the likelihood of a successful defense, and the wisdom of a chosen course of action, the ultimate decision of whether to go to trial must be made by the person who will bear the ultimate consequence of a conviction.

*Smith,* 148 F.3d at 552.

Petitioner alleges that his counsel failed to advise him that he could resolve the case by negotiating a plea bargain.[1]  Petitioner alleges that, several months before trial, his attorney  told him that he had informally discussed with the previous lead prosecutor the possibility of a guilty plea and a sentence of five years' imprisonment, but that the government had never formally extended such an offer.  *Memorandum in Support*, ECF No. 1252-2, PageID# 26334.  Petitioner represents that he did not know that he could negotiate a guilty plea.  *Id.* at PageID# 26335.  Petitioner also alleges that his attorney never advised him of his potential sentencing exposure, the strength of the government's case, the impact of the United States Sentencing Guidelines, or the benefit of providing substantial assistance.  *Id.* at PageID# 26336.  His attorney did not explain that, even if some of his convictions were reversed on appeal, the Court could nevertheless impose the same sentence on remand.  *Id.* at PageID# 26337.  The record, however, reflects that Petitioner had no interest in pursuing a plea bargain.

The following exchange occurred at the conclusion of *voir dire*:

MR. SQUIRES:  The government wanted to make a record with the defendants present before the Court that we have offered before trial to sit down with defendants in plea negotiations.  That was specifically discussed with each attorney.  That offer would extend both during – to and during trial.  We wanted to make sure that was clear for the record with these defendants present, that that offer and overture was made by the government.

---

[1] According to Petitioner, "the possibility of a plea deal offered by AUSA Squires, on February 6, 2008, moments before the trial was not known or discussed" and he "was never afforded the opportunity to make an informed decision relative [to] the AUSA's offer."  *Affidavit of Donald H. Ayers*, ECF No. 1252, PageID# 26414.

COURT:  And as is typically my practice, I will ask each defendant on the record if offers of plea negotiations have been transmitted to them through their counsel.

Mr. Ayers?

MR. AYERS:  Yes, Your Honor.

COURT:  Were you advised by your lawyers of offers of plea negotiations by the government?

MR. DICKERSON:  Your Honor, what I would phrase it as a telephone discussion with Mr. Squires in the last two weeks as to whether or not there's any plea offers available based upon a rumor that I heard, and Mr. Squires said we could talk about it.

COURT:  That's why I phrase it as offers of plea negotiations.  I didn't say a specific plea.  I said were you advised that the government was willing and interested in entering into discussions of a plea?

MR. DICKERSON:  That's the basis of it, and that was conveyed to Mr. Ayers.

COURT:  But Mr. Ayers has to answer.

MR. AYERS:  That's correct, sir.

COURT:  And you made the decision not to pursue those?

MR. AYERS:  Absolutely.

COURT:  All right.  Thank you.

*Transcript,* ECF No. 745, PageID# 15474-75.

The record belies Petitioner's allegation that he did not know that he could negotiate a plea agreement with the government.  *See, e.g., McGowan v. Burt*, -- F.3d --, 2015 WL 3541201 (6th Cir. June 8, 2015)(Petitioner's claim that he did not understand the prosecution's plea offer in a post-judgment hearing refuted by his on-the-record statements prior to trial indicating that "he understood. . . and wanted to proceed to trial despite counsel's advice that he 'should strongly consider' the prosecution's offer.")  Where a defendant insists on proceeding to trial, an attorney does not perform in a constitutionally ineffective manner by failing to pursue potential

plea negotiations. *Hardison v. United States*, No. 3:07-cr-10-3-R; 3:11-cv-00305-R, 2012 WL 6839716, at *11 (W.D. Ky. Oct. 26, 2012)(citing *Moss v. United States*, 323 F.3d 445, 474-75 (6th Cir. 2003); *Welch v. United States*, 370 Fed.Appx 739, 742-43 (7th Cir. 2010); *Ray v. Wolfenbarger*, No. 08-cv-11415, 2011 WL 839173, at *8 (E.D. Mich. March 7, 2011)).

The record reflects that Petitioner had no interest in pursuing plea negotiations. Under these circumstances, Petitioner has failed to "demonstrate a reasonable probability" that he would have accepted a plea bargain. *See Missouri v. Frye*, 132 S.Ct. at 1409.

**Good Faith Reliance Defense**

Petitioner also alleges that his counsel failed to raise a defense based on good faith reliance. *Memorandum in Support*, ECF No. 1252-2, PageID# 26343; *see also id.* at PageID# 26344-51. Petitioner specifically complains that his attorneys failed to call defense witnesses who could have assisted in establishing that he acted in good faith and had no criminal intent. *Id.* at PageID# 26353. Petitioner also complains of his attorneys' failure to request a specific jury instruction on the issue. *Id.* at PageID# 26353-54.

Defense counsel's "failure to investigate and call a witness who can provide testimony favorable to the defense can be ineffective assistance, if the offering of such testimony results in a reasonable probability of an acquittal." *Troglin v. Westbrooks*, No. 1:12-cv-41, 2014 WL 5810312, at *8 (E.D. Tenn. Nov. 7, 2014)(citing *Towns v. Smith*, 395 F.3d 251, 258-60 (6th Cir. 2005)). However, an attorney "'has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant.'" *Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004) (quotation omitted). "Nor must an attorney 'interview every possible witness to have performed proficiently.'" *Troglin*, 2014 WL 5810312, at *8 (quoting *Riley v. Payne*, 352 F.3d 1313, 1318 (9th Cir. 2003). "Complaints about uncalled witnesses are not favored because

the presentation of testimonial evidence is a matter of trial strategy." *Id.* (citing *Coble v. Dretke,* 444 F.3d 345, 350 (5th Cir. 2006)).

Once again, Petitioner has failed to establish *Strickland*'s prejudice component, which requires evidence that establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Defense counsel in fact argued, *inter alia*, that the government could not carry its burden of proof and that Petitioner lacked the requisite criminal intent. For example, in opening statement, Petitioner's counsel reminded the jury that the government bore the burden of proof and that Petitioner had pledged 2 million dollars of his own money to help start NCFE, which grew over time to a staff of 350 persons and three operational divisions which had little interaction with each other. *Trial Transcript*, *Vol 1*, ECF No. 549, PageID# 6382-84. Counsel urged the jury not to rely on the testimony of prosecution witnesses, who would testify pursuant to the terms of negotiated plea agreements and who had made prior inconsistent statements. Counsel specifically argued that Petitioner had reasonably relied on the advice and expertise of attorneys from three law firms who were actively involved in company operations and who had drafted confusing and complex legal documents "advising corporate investors on the ability and requirement to read all the documents." *Id.* at PageID# 6386-87; 6390. Petitioner's counsel argued that the "sophisticated" investors in NCFE had also relied on the experts, and not on the representations of Petitioner or anyone else from NCFE. *Id.* at PageID# 6390. Petitioner was portrayed as having based his presentations to investors on documents created by lawyers and

other experts, *id*. at PageID# 6390-91, and as having no prior experience in this type of company operation.  *Id.* at PageID# 6393-94.[2]

During the course of the trial, Petitioner's counsel vigorously cross-examined prosecution witnesses, including William Parizek, Jon Beacham,  Bryan Weiss, Stanley Haines, Jessica Bily, Amy Boothe, Donna Talbot, Sherry Gibson, and Terrence Glomski, all of whom provided testimony relevant to Petitioner's theory of defense.  *See Answer and Motion to Dismiss*, ECF No. 1282, PageID# 26616-26624.   Petitioner's counsel also called three defense experts to establish that Petitioner lacked knowledge of criminal wrongdoing and reasonably relied on others involved in the company operations.  Petitioner also acknowledges that the testimony of some prosecution witnesses supported his good faith defense*.  See Traverse*, ECF No. 1288, PageID# 26733-34.   Petitioner has provided no affidavits or statements from any additional witnesses who might have offered further support for this defense.  Under these circumstances, Petitioner has not established that his attorney performed in a constitutionally ineffective manner in failing to call additional defense witnesses.   "'Generally, a petition for habeas corpus relief based on counsel's failure to call witnesses must present this evidence in the form of the actual testimony by the witness or affidavits.'"   *Williams v. Stovall,* No. 06-15386, 2009 WL 1212980, at *17 (E.D. Mich. April 29, 2009)(quoting *United States ex rel. Townsend v. Young*, No. 01 C 0800, 2001 WL 910387, at *5 (N.D.Ill. Aug.8, 2001)(internal citation omitted)(also citing *Pittman v. Florida*, No. 8:05–cv–1700, 2008 WL 2414027, at *12 (M.D.Fla. June 11, 2008)); *see also Caudill v. Conover*, No. 5:10-84-DCR, 2014 WL 349300, at *55 (E.D. Ky. Jan. 31, 2014)(citing *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002)("[A]bsent record evidence of counsel's reasons for not calling a witness, the court must presume that the decision was based

---

[2] Petitioner's prior experience was in hospital administration.  *Id.* at PageID# 6393-94.

upon trial strategy"). "Trial counsel's 'failure to call witnesses is presumed to be trial strategy.'"

*English v. Romanowski*, 602 F.3d 714, 720 (6th Cir. 2010)(quoting *People v. Mitchell*, 454 Mich. 145, 163, 560 N.W.2d 600 (1997)).  "[D]ecisions as to what evidence to present and whether to call certain witnesses are presumed to be matters of trial strategy."  *Davis v. Ludwick*, No. 10-cv-11240, 2015 WL 871211, at *9 (E.D. Mich. Feb. 27, 2015).

The trial in this case lasted six weeks.  It appears from the record that defense counsel engaged in a reasonable trial strategy by choosing not to call additional defense witnesses to provide what would have amounted to cumulative evidence. Judicial scrutiny of defense counsel's performance "must be highly deferential."  *Strickland*, 466 U.S. at 689.

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac*, 456 U.S. 107, 133–134, 102 S.Ct. 1558, 1574–1575, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See Michel v. Louisiana, supra*, 350 U.S. [91], 101 [1955]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. *See* Goodpaster, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 N.Y.U.L.Rev. 299, 343 (1983).

*Id*. at 689-90.  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Id*. at 690.  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]"  *Id*. at 690-91.

Petitioner also complains that his counsel failed to request a jury instruction on his good faith defense. However, the record establishes that the Court instructed the jury on good faith reliance:

> An honest belief or good faith belief by a defendant that the statements or representations made were true is a complete and total defense to the charge of securities fraud in Counts 2 through 7 of the indictment because such an honest or good faith belief is absolutely inconsistent with a fraudulent intent.
>
> If the jury has a reasonable doubt as to whether a defendant acted with an intent to defaud or acted in good faith, the jury must acquit that defendant.
>
> The good faith of the defendants is a complete defense to the charge of securities fraud contained in Counts 2 through 7 of the indictment, because good faith on the part of the defendant is, simply, inconsistent with the intent to defraud.
>
> A person who acts, or causes another person to act, on a belief or an opinion honestly held is not punishable under this statute merely because the belief or opinion turns out to be inaccurate, incorrect or wrong.  An honest mistake in judgment or an honest error in management does not rise to the level of criminal conduct.
>
> ***
>
> While the term good faith has no precise definition, it encompasses, among other things, a belief or honestly held opinion, and absence of malice or ill will, and an intention to avoid taking unfair advantage of another.
>
> ***
>
> The burden of proving good faith does not rest with the defendants with respect to these charges.  It is the government's burden to prove to you, beyond a reasonable doubt, that the defendants acted with an intent to defraud.
>
> If the evidence in any or all of Counts 2 through 7 leaves you with the reasonable doubt as to whether the charged defendant acted with an intent to defraud or in good faith related to Counts 1 through 7, then you must acquit that defendant on all those counts.

*Trial Transcript, Vol. XXI*, ECF No. 569, PageID# 10628-29.  The fact that the jury chose not to credit that defense does not mean that Petitioner's counsel was constitutionally ineffective.

Petitioner has failed to establish the denial of the effective assistance of counsel under the two-prong *Strickland* test based on counsel's failure to present a good faith reliance defense.

## **Defense Witness Jon Bryant**

Petitioner alleges that his counsel performed in a constitutionally ineffective manner by failing to properly investigate defense expert Jon Bryant. According to Petitioner, he expected his attorneys to take extra precautions before calling Bryant as a witness, since Bryant had previously made statements to the authorities. *Memorandum in Support*, ECF No. 1252, PageID# 26357.

Petitioner describes Bryant as the "securitization" expert who supported Petitioner's claim that he lacked criminal intent. *Id.* at PageID# 26357. Bryant operated the "AS400," *Trial Transcript*, *Vol. XVI*, ECF No. 564, PageID# 9668-9671, which assisted the company in maintaining large volumes of data central to the collateralization of funds. The defense posited that NCFE had lost data relating to millions of dollars of accounts receivable as a result of the government's seizure of the system, and "Bryant testified [to] the impact of the government's careless handling of the system resulting in the crash of numerous data fields representing millions of dollars of collateral," and thereby rendering it impossible to determine whether NCFE had maintained sufficient collateralization. *Memorandum in Support*, ECF No. 1252-2, PageID# 26358.

Petitioner complains that his attorneys did not learn until the cross-examination of Bryant of an "FBI-302 Report" memorializing "extensive conversations between Bryant and the F.B.I." that conflicted with Bryant's testimony on direct. Petitioner claims that he was thereby prejudiced because otherwise inadmissible hearsay evidence was then permitted. Petitioner

characterizes the presentation of Bryant's testimony as reflective of an unreasonable trial strategy. *Id.* at PageID# 26359.

The United States Court of Appeals for the Sixth Circuit, in considering the appeal of one of Petitioner's co-defendants, held that the government had no obligation to disclose, prior to trial, the F.B.I. report referred to by Petitioner. *United States v. Faulkenberry,* 614 F.3d 573, 590 (6th Cir. 2010):

> Bryant had worked at NCFE (apparently as an independent contractor) as the administrator of its computer system. After NCFE's bankruptcy, he met with the FBI to discuss his work there. All the defendants' counsel were aware of that fact, but nonetheless decided jointly to hire Bryant as an expert witness to testify about NCFE's computer system. The only thing they did not know was the unsurprising fact that the FBI had summarized its interviews of Bryant in so-called FBI–302 reports. Thereafter, at trial, Bryant testified on direct examination that he was unaware of any false data on NCFE's computer system. The government impeached that testimony on cross, using the FBI–302 reports. Two days later, Faulkenberry's counsel moved for a mistrial, asserting that the existence of the reports was "a complete surprise." Faulkenberry now contends that the government's failure to produce the reports before trial violated both Federal Rule of Criminal Procedure 16(a)(1)(E)(i) and his due-process right to a fundamentally fair trial.

> To which there are several responses. The basic one, as the district court correctly observed, is that defendants' counsel took a calculated risk in hiring a witness who had met with the FBI during its investigation of their clients. Further, there is no evidence that the government had any knowledge as to whether Bryant had in any way misled defendants' counsel regarding the extent of his discussions with the FBI. That the government cross-examined Bryant with a document summarizing what he had told the FBI earlier, therefore, did not violate Faulkenberry's right to due process.

*Id*.

As noted *supra*, an attorney's decision regarding a defense witness is presumed to be a matter of trial strategy. *See Davis v. Ludwick*, 2015 WL 871211, at *9. The decision of Petitioner's counsel in this regard does not appear to have been so unreasonable as to amount to constitutionally ineffective assistance. It is significant, moreover, that the attorneys for

16

Petitioner's co-defendants also decided to call Bryant to testify for the defense; Bryant's testimony would therefore have been presented, presumably, even if Petitioner's counsel had not called him.

**Loss**

Petitioner alleges that he was denied the effective assistance of counsel because his attorneys failed to investigate the amount of investor loss.  He specifically alleges that his counsel failed to request the basis for the government's calculation of loss, and that the government presented invalid loss figures.  *Memorandum in Support*, ECF No. 1252-2, PageID# 26364-65.  In this regard, Petitioner complains that the government failed to offset the loss calculation by amounts recovered in settlements with or other recoveries by the alleged victims, in either ongoing or future civil litigation.  *See Amendment One*, ECF No. 1281; *Amendment Number Two*, ECF No. 1315.  According to Petitioner, these unreliable loss estimates tainted the jury's consideration of the case against him.

The *Pre-sentence Investigation Report* indicates that investigation had disclosed losses totaling $2,894,150.00.  That amount was offset by recovery totaling $504,500,714.32, resulting in a balance of $2,389,649,785.68.  *Pre-sentence Investigation Report*, ¶ 54.  The *Pre-sentence Investigation Report* specifically listed the alleged victims in the case and the itemized amounts of restitution due each of them.  *Id*. at ¶ 126.[3]  The *Supplemental Addendum* to the *Pre-sentence Investigation Report* reduced the figure to $2,387,050,059.03, based on recovery by Riversource Investments and American Express Financial Advisors in the amount of $ 7,400,273,35.  Defense counsel objected to the government's loss figures, arguing that the government had failed to properly establish the estimate and raising the same argument that Petitioner raises in

---

[3] The *Pre-sentence Investigation Report* indicates that these figures may be updated in the future.  ¶ 124.

this action.  *See Donald H. Ayers' Sentencing Memorandum*, ECF No. 728 (filed under seal).[4]

Petitioner's counsel argued that the government's analysis had improperly failed to consider the

intended loss by Petitioner, the actual loss, and factors that contributed to the loss.  *Sentencing*

*Transcript,* ECF No. 837, PageID# 16392.

> The testimony from Mr. Glomski. . . stated that he absolutely understood that $1.3 billion was going to be diverted by providers from NCFE's lockboxes if a controlled wind down was not implemented.
>
> None of these dollars, the diversion of funds by the health care providers, are taken into consideration at all in this loss factor.  One of the witnesses the government presented acknowledged $1.3 billion, he knew at least that if it was not properly handled as a wind down, was going to be diverted.
>
> This Court heard testimony from three separate providers who all acknowledged diverting funds from NCFE, money that was suppose[d] to go to the investors.  Diversion of funds:  we had a whole discussion in this trial.  Stolen.  These providers took money that was suppose[d] to go back to NCFE and then to the investors, and they kept it for themselves.  They diverted the money from the lockboxes that was originally expected to go to NPF VI or NPF XII.
>
> That is not considered at all in these calculations.  None of that is considered when it should be considered as far as what an actual loss is.  There wasn't an actual loss of the $1.3 billion that was diverted.  Mr. Ayers wasn't a part of those providers that diverted that money.
>
> These actions that occurred after October 31st 2002, when every investor had been paid in full, and these members – Mr. Ayers specifically – were taken off the board, and new counsel. . . placed this entity in bankruptcy.  None of those factors were taken into consideration as to what this actual loss is.
>
> . . . [T]here was nothing. . . presented to this Court that goes above and beyond the $400 million factor.

*Id.* at PageID# 16392-94.  Petitioner's counsel also argued that

> [t]he government had the opportunity to present testimony at trial of those who lost money, but choose not to do so.  Up through October 2002, all investor[s] were paid.  The alleged "loss" occurred after the November 2002 bankruptcy (after Mr. Ayers' retirement) and after the investor committee decided to not fund

---

[4] Defense counsel renewed his prior objections at the re-sentencing hearing.  *Re-sentencing Transcript* (Dec. 3, 2010)*,* ECF No. 1099, PageID# 23287.

the healthcare providers, after they were duly warned of the consequences that would result. . . .

*Donald H.Ayers' Sentencing Memorandum*, ECF No. 728, PageID# 14485 (filed under seal).

The arguments made by Petitioner's counsel in connection with the calculation of loss at sentencing were unsuccessful, and Petitioner points to no additional evidence that would have affected the sentence imposed. Moreover, Petitioner's base offense level under the advisory United States Sentencing Guidelines would have been increased by thirty points for *any* loss of more than $400,000,000. U.S.S.G. § 2B1.1(b)(1)(P). Thus, figures even far greater than $400,000,000 did not affect Petitioner's recommended guideline sentence. Additionally, only loss recovered "from the disposition of the collateral or. . . the fair market value of the collateral at the time of sentencing" could properly be used in reducing the loss calculation. U.S.S.G. § 2B1.1, Application Note 2(E)(ii).

> Once the amount of actual loss is established, that amount is to be reduced by both (1) the amount paid by the defendant to his victims before the fraud was discovered, and (2) the amount of collateral that has been collected at the time of sentencing. U.S.S.G. § 2B1.1, Application Note 2(E).

*United States v. Erpenbeck*, 532 F.3d 423, 433-34 (6th Cir. 2008). Thus, potential recovery expected after sentencing or anticipated from ongoing civil litigation would not have served to reduce Petitioner's recommended sentence. In any event, Petitioner's counsel argued that the government's estimate of loss far overstated the gravity of the offense and should not be used in determining an appropriate sentence. The Court essentially agreed with that contention. Recognizing that Petitioner's particularly harsh recommended sentence under the advisory sentencing guidelines was driven primarily by the loss calculation, which served to significantly increase his base offense level, the Court "decline[d] to impose a within-guideline sentence." *Re-Sentencing Transcript* (Dec. 3, 2010), ECF No. 1099, PageID# 23315.

At the re-sentencing hearing, the government argued that the same loss figures applied, despite the reversal of Petitioner's money laundering conspiracy conviction, because the amount of loss also related to Petitioner's fraud convictions.  *Re-Sentencing Transcript* (Dec. 3, 2010)*,* ECF 1099, PageID# 23284-85.  Defense counsel argued to the contrary:

> I think its even more unclear now what the loss factor is because, in the analysis of the loss factor, you have the money laundering and the money going out, and that tracking of money going out versus what truly is any loss to investors pursuant to Counts 1 and 2 through 7.  So just for the record, I think that needs to be cleared up in the PSR as well.
>
> . . . I don't have access to it, but I know the government has access with the trustee of the bankruptcy, any additional payments that have came [sic] in because that litigation is still proceeding, and there's been settlements and payments since August 8th, 2008.

*Id.* at PageID# 23283.  The Court rejected the argument.  *Id.* at PageID# 23286.

Notwithstanding the sentence imposed and the Court's rejection of the arguments of Petitioner's counsel,  Petitioner has failed to establish that his counsel were constitutionally ineffective because they failed to investigate the government's calculation of loss.

### **"New Rule"**

Petitioner alleges  that his counsel performed in a constitutionally ineffective manner by failing to preserve for appeal a claim under *United States v. Pepper,* 562 U.S. 476 (2011). *Pepper,* decided on March 2, 2011, or approximately three months after Petitioner's December 3, 2010, re-sentencing hearing, stands for the proposition that, where a case is remanded for re-sentencing, a court may consider evidence of a defendant's rehabilitation since the time of the prior sentencing hearing. Such evidence may support a downward variance from the advisory sentence under the United States Sentencing Guidelines. *Id*. at 490.

On remand from the Sixth Circuit, the Court conducted a *de novo* sentencing. *Re-sentencing Transcript* (Dec. 3, 2010)*,* ECF No. 1099, PageID# 23276-77; 23281.  Defense

counsel argued that Petitioner's incarceration since the original sentencing had positively affected his attitude.  *Id.* at PageID# 23288.  According to Petitioner's counsel, Petitioner was deeply regretful, had attempted to assist the government in locating a co-defendant who had absconded, and was very much a different person.  *Id.* at PageID# 23313.

> This would never happen again in Mr. Ayers' life.  The man that's sitting in that prison now is a very defeated, humble man.  But he's still very intelligent.  He helps inmates out.  He does research with inmates.  Down there, he is a stellar inmate. . . . If Mr. Ayers could have done it all over again, I guarantee you it would have been a change in lifestyle period, and he would have been the person that would have been the whistle-blower on this aspect.  And that's what Mr. Ayers would tell you today.

*Id.* at PageID# 23314-15.  Counsel argued for a term of five years' imprisonment, taking particular note of Petitioner's age and of sentences imposed on certain co-defendants and in other cases of a similar nature.  *Id.* at PageID# 23290-93.  The Court rejected these arguments, however.

Petitioner complains that he provided his counsel with "a plethora" of post-conviction rehabilitation activities but that his counsel refused to present that information at the re-sentencing hearing. *Memorandum in Support*, ECF No. 1252-2 PageID# 26370. To the contrary, the record indicates that counsel submitted many letters from Petitioner's family and friends indicating that "he is a man of considerable integrity. . . and generosity."  *Re-sentencing Transcript* (Dec. 3, 2010)*, ECF No. 1099, PageID# 23307.  Petitioner has pointed to no additional evidence that would have resulted in a lower sentence than the aggregate term of fifteen years actually imposed – which, as was noted *supra*, was substantially below the sentence recommended by the advisory sentencing guidelines and well below the statutory maximum of

35 years' imprisonment.  *See Re-sentencing Transcript* (Dec. 3, 2010), ECF No. 1099, PageID# 23287; *Judgment,* ECF No.  1100.[5]

Petitioner has failed to establish the denial of the effective assistance of counsel based on his attorney's failure to raise a claim under *Pepper.*

## PROSECUTORIAL  MISCONDUCT

Petitioner alleges that he was denied a fair trial because of prosecutorial misconduct. According to Petitioner, the prosecution falsified facts, presented perjured testimony, and distorted and mislead the jury, in part, in order to legitimize their closure of a legitimate business.  *Memorandum in Support*, ECF No. 1252-2, PageID# 26375-76; 26381; 26384.  The scope of federal habeas corpus review of a claim of prosecutorial misconduct is narrow. A federal court does not sit as an appellate court employing supervisory powers to rectify ordinary trial error in cases before it for habeas review.  *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). Rather, a court must consider only whether the prosecutor's conduct was so egregious as to deny the petitioner fundamental fairness.  *Id*., at 642-43; *Martin v. Foltz*, 773 F.2d 711, 716–17 (6th Cir. 1985); *Angel v. Overberg*, 682 F.2dd 605, 607 (6th Cir. 1982) (*en banc*).

> The Sixth Circuit has adopted a two-step approach for determining whether prosecutorial misconduct violates a defendant's due process rights. *See Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) (citing *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)); *Boyle v. Million,* 201 F.3d 711, 717 (6th Cir. 2000). First, the Court must consider whether the prosecutor's conduct and remarks were improper. *See Macias*, 291 F.3d at 452 (citing same). Second, if the Court concludes that the remarks were improper, then the Court must apply the four-factor test set forth by the Sixth Circuit in *United States v. Carroll,* 26 F.3d 1380, 1385 (6th Cir. 1994), to determine "whether the impropriety was flagrant" and thus violated the defendant's due process rights. *Macias*, 291 F.3d at 452 (quoting *Carter,* 236 F.3d at 783). The four factors are: (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the

---

[5] Petitioner did not raise a claim under *Pepper* on appeal from his re-sentencing.  *See United States of America v. Ayers,* Case No. 10-4617 (6th Cir. Mar, 14, 2012); *Order*, ECF No. 1146.  Under these circumstances, it is unclear how Petitioner was prejudiced by his counsel's alleged failure to preserve this issue for appeal.

> defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong. *See Macias*, 291 F.3d at 452 (quoting *Carter*, 236 F.3d at 783).

*Anderson v. United States*, 246 F.Supp.2d 758, 760-61 (E.D. Michigan 2003).

In support of his claim of prosecutorial misconduct, Petitioner insists that he is innocent of the charges upon which he stands convicted. *Memorandum in Support*, ECF No. 1252-2, PageID# 26374-84. The record, however, reflects substantial evidence of guilt. *See Opinion and Order on Defendants' Post-Trial Motions,* ECF No. 758. Moreover, the Sixth Circuit rejected Petitioner's claim that the evidence was constitutionally insufficient to sustain his convictions. *United States v. Ayers,* 386 Fed.Appx. 558, 562-64. The Court will not again address that issue here. Simply put, Petitioner has failed to establish that the government acted improperly in instituting the criminal prosecution against him.

Petitioner also argues that the government used false and misleading figures in its calculation of victim loss in order to "prop up" the case against him. *Memorandum in Support*, ECF No. 1252-2, PageID# 26377. Petitioner specifically contends that investors abandoned collateral, chose not to enforce the trustee's obligation to collect on available collateral, and strategically pursued recovery through civil litigation. *Amendment One*, ECF No. 1281, PageID# 26587-95. Even assuming this contention, however, the loss suffered is not thereby reduced.

Petitioner also contends that the government adopted inconsistent positions on the amount of loss. In this regard, Petitioner specifically refers to proceedings against another NCFE-related defendant, Sherry Gibson, who plead guilty pursuant to a plea agreement to a charge of conspiracy to use interstate commerce for the purpose of fraud or deceit in the sale of securities in violation of 18 U.S.C. § 371. *United States v. Gibson*, 2:03-cr-119 (S.D. Ohio). According to Petitioner, the government agreed in that case, *see id., Statement of Facts,* ECF No.

4, that "$1.4 billion of <u>actual</u> receivables existed in Portfolio NPF XII . . . [and] in Portfolio NPF VI to be as claimed, $900 million plus." *Reply,* ECF No. 1288, PageID# 26738 (emphasis in original). "[T]hat record shows no indication that the <u>actual</u> receivables in NPF XII and the claimed receivables in NPF VI were fraudulent." *Id*. (emphasis in original). Petitioner mischaracterizes the *Statement of Facts* in *United States v. Gibson*, 2:03-CR-119.  In it, Gibson states that, "[a]s of June 30, 2002, <u>NCFE claimed</u> the net value of all purchased receivables for NPF VI was $908,980,775. . . . As of July 1, 2001, <u>NCFE claimed</u> the net value of all purchased receivables for NPF XII was 2,149,488,559."  *Id.* (emphasis added). The *Statement of Facts* recounts only the claims being made by NCFE at certain times, not the actual value of purchased receivables.  The *Statement of Facts* made clear that these claims were fraudulent. *See, e.g., id*. ("To pass the collateral coverage test in NPF XII, we have been adding receivables to the calculation in the investor report."   "Due to the continual shortage of cash in the reserves, the investor reports, therefore, have OVERSTATED the receivables compared to the actual balances[.]")  Gibson's testimony at Petitioner's trial was not inconsistent with the *Statement of Facts* filed in the criminal case against her. She testified that, in November 2002, NPF VI held outstanding notes totaling approximately $900 million, and that NPF XII held outstanding notes totaling approximately $2 billion.  *Trial Transcript*, *Vol. X*, ECF No. 558, PageID# 8416. However, Gibson also testified that "data would be manipulated in any way necessary in order to make compliance on the report." *Id.* at PageID# 8319. She testified generally that the monthly investor reports were manipulated and untruthful.  *See generally Trial Transcript, Vol. X*, ECF No. 558, *Trial Transcript, Vol. XI*, ECF No. 559. Other prosecution witnesses corroborated this testimony. *See Response and Motion to Dismiss*, ECF No. 1282, PageID# 26649-51.

In summary, Petitioner has failed to establish his claim of prosecutorial misconduct.

**SENTENCING**

Petitioner makes various arguments in support of his claim that the Court imposed an unconstitutional sentence.  Citing *Peugh v. United States*, -- U.S. --, 133 S.Ct. 2072 (2013), Petitioner first alleges that his sentence violated the Ex Post Facto Clause because the Court used the 2007 version of the advisory United States Sentencing Guidelines rather than the 2002 version in effect at the time of the commission of the alleged offenses.  Had the Court used the 2002 version of the sentencing guidelines, Petitioner contends, a reduced sentence would have been imposed.  Petitioner also alleges that the Court improperly determined his sentence prior to the re-sentencing hearing.

In *Peugh*, the Supreme Court held that a violation of the Ex Post Facto Clause occurs "when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines range than the version in place at the time of the offense." *Peugh*, -- U.S. --, --, 133 S.Ct. at 2078.  "If the defendant's sentencing range is greater under the Guidelines in effect on the date of sentencing, the district court must apply the Guidelines in effect at the time of the offense to avoid an ex post facto violation." *Huff v. United States*, 734 F.3d 600, 608 (6th Cir. 2013)(citation omitted).  However, the United States Court of Appeals for the Sixth Circuit has held that *Peugh* is not retroactively applicable to cases that had become final prior to *Peugh. Rogers v. United States*, 561 F. App'x 440, 443–44 (6th Cir. 2014)(citing *Teague v. Lane*, 489 U.S. 288, 310-11 (1989)). *See also Herrera–Gomez v. United States*, 755 F.3d 142, 147 (2d Cir. 2014); *Hawkins v. United States*, 724 F.3d 915, 917-18 (7th Cir. 2013). Petitioner's convictions became final on October 1, 2012, when the United States Supreme Court denied Petitioner's petition for a writ of *certiorari.*  ECF No. 1208.  Therefore, *Peugh* – which was decided in 2013 - has no application to this case. *See*

*Norman v. United States*, 1:12cr252, 1:13cv2661, 2014 WL 7409954, at *3 (N.D. Ohio Dec. 31, 2014).

Similarly unpersuasive is Petitioner's claim that the Court determined his sentence prior to the re-sentencing hearing.  As noted *supra*, Petitioner's original conviction on the money laundering conspiracy count was reversed and the matter was remanded for sentencing. The re-sentencing hearing was originally scheduled for October 13, 2010.  *Notice of Hearing*, ECF No. 1059. At that hearing, the Court requested further briefing on the issue of the impact of the Double Jeopardy Clause and the sentencing package doctrine.  *Re-sentencing Transcript* (Oct. 13, 2010), ECF No. 1092, PageID# 23193. At the October 22, 2010 re-sentencing hearing, the Court noted that the parties' "briefs were thorough and comprehensive,"  *Re-sentencing Transcript* (Oct. 22, 2010), ECF No. 1093, PageID# 23200, but that counsel would nevertheless have the "opportunity to be heard if there is anything further counsel wishes to put on the record." *Id*. Petitioner's request to continue the re-sentencing, made by his counsel, was granted. *Id.* at PageID# 23253. Petitioner's re-sentencing hearing went forward on December 3, 2010. *Re-sentencing Transcript* (Dec. 3, 2010), ECF No. 1099.  Petitioner's counsel "s[tood] on the sentencing memorandum and the previous arguments that we made on October 22nd," *id*. at PageID 23267,  but presented additional, lengthy, argument to the Court.  *See generally id*. This record simply offers no support for Petitioner's claim that the Court had determined his sentence before the sentencing hearing or that his sentence was unconstitutionally imposed.

Petitioner also alleges that his sentence was improperly enhanced pursuant to U.S.S.G. § 2B1.1(b)(1) by the amount of loss suffered by alleged victims.[6]  Specifically, Petitioner

---

[6] Petitioner also complains that the government failed to establish by clear and convincing evidence the amount of that loss. *Memorandum in Support*, ECF No. 1252-2, PageID# 26393.Where the amount of loss is in dispute, the appropriate standard of proof of loss is preponderance of the evidence.  *See United States v. Poulsen*, 655 F.3d 492, 513 (6th Cir. 2011).

complains that the calculation of loss was derived from "a report showing bonds outstanding as of November 2002," and not from certifications or affidavits of investors who had experienced loss. *Id.* at PageID# 26393-95. He complains that the government had information contradicting the probation officer's determination of loss and yet made no attempt to disclose that information. *Id.* at PageID# 26395. Petitioner argues that "[t]he idea to substitute an 'outstanding bonds' listing in lieu of 'value of funds' that were laundered and used later for securities fraud, is an ill conceived concept that was extremely prejudicial to the Movant." *Id.* at PageID# 26396. Petitioner also contends that the reversal of his money laundering conspiracy conviction should have reduced the government's estimate of the amount of loss. *Id.*

At the December 3, 2010 re-sentencing hearing, the Court agreed with the government and the probation officer that the loss attributable to Petitioner's money laundering conspiracy conviction applied equally to Petitioner's fraud related convictions. *Re-sentencing Transcript* (Dec. 3, 2010), ECF No. 1099, PageID# 23286. Therefore, the Court did not reduce the loss figure at re-sentencing following the reversal of Petitioner's money laundering conspiracy conviction. Although Petitioner's counsel objected to that finding, *id.*, there is no support in the record for Petitioner's allegation that the government possessed and yet failed to disclose documents that would have reduced the loss figures that were used to increase Petitioner's recommended sentence under the advisory sentencing guidelines. *See also United States v. Poulsen*, 655 F.3d 492, 514 (6th Cir. 2011)(A sentencing court need not take into consideration other causes for the loss). Moreover, Petitioner points to no authority requiring the government to provide affidavits from alleged victims.

Finally, Petitioner alleges that his sentence violates *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Blakely v. Washington*, 542 U.S. 296 (2004), and *Alleyne v. United States*, -- U.S. --, 133

S.Ct. 2151 (2013), because his recommended sentence under the advisory United States Sentencing Guidelines was increased, pursuant U.S.S.G. § 2B1.1(b)(1),[7] from 33 to 41 months' incarceration to that of life imprisonment, based on a judicial finding on the amount of loss. *Memorandum in Support*, ECF No. 1252-2, PageID# 26401-07.

Petitioner has procedurally defaulted this claim because he failed to raise it on direct appeal. Further, Petitioner has failed to establish cause and prejudice for this procedural default. *See Massaro v. United States,* 538 U.S. 500, 504 (2003)(citing *United States v. Frady*, 456 U.S. at 167-68)). In any event, however, the claim is without merit.

*Apprendi* held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi,* 530 U.S. at 490. In *Blakely,* the Supreme Court explained that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Thompson v. Warden, Belmont Correctional Inst.*, 598 F.3d 281, 286 (6th Cir.2010)(citing *Blakely,* 542 U.S. at 303). In *Alleyne,* the Supreme Court extended *Apprendi* to mandatory minimum sentences, holding that any fact that serves to increase a mandatory minimum term must be considered an "element" of the offense and must be submitted to the jury and proven beyond a reasonable doubt. *Alleyne*, 133 S.Ct. at 2158 (Thomas, J., plurality opinion).[8]

---

[7] § 2B1.1(b)(1) provides for an increase in the total offense level based upon the amount of loss.
[8] The Supreme Court has not held that *Alleyne,* decided after Petitioner's conviction became final, is to be applied retroactively to cases on collateral review. The United States Court of Appeals for the Sixth Circuit has held that it does not. *In re Mazzio*, 756 F.3d 487 (6th Cir., 2014).

Here, the determination of the amount of loss resulted in neither the imposition of a sentence greater than the prescribed statutory maximum nor the statutory minimum term. Consequently, there was no violation of *Apprendi, Blakely*, or *Alleyne*.

> [W]e take care to note what our holding does not entail. Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment. *See, e.g., Dillon v. United States*, 560 U.S. ——, ——, 130 S.Ct. 2683, 2692, 177 L.Ed.2d 271 (2010) ("[W]ithin established limits[,] . . . the exercise of [sentencing] discretion does not contravene the Sixth Amendment even if it is informed by judge-found facts" (emphasis deleted and internal quotation marks omitted)); *Apprendi,* 530 U.S., at 481, 120 S.Ct. 2348 ("[N]othing in this history suggests that it is impermissible for judges to exercise discretion - taking into consideration various factors relating both to offense and offender - in imposing a judgment within the range prescribed by statute").
>
> ***
>
> "[E]stablishing what punishment is available by law and setting a specific punishment within the bounds that the law has prescribed are two different things." *Apprendi, supra*, at 519, 120 S.Ct. 2348 (THOMAS, J., concurring). Our decision today is wholly consistent with the broad discretion of judges to select a sentence within the range authorized by law.

*Alleyne*, 133 S.Ct. at 2163-64 (footnote omitted).

Petitioner has failed to establish that his sentence was unconstitutionally imposed.

## RECOMMENDED DISPOSITION

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that Respondent's *Answer and Motion to Dismiss*, ECF No. 1282, be **GRANTED** and that this action be **DISMISSED.**

**PROCEDURE ON OBJECTIONS**

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

   *s/ Norah McCann King*
Norah McCann King
United States Magistrate Judge
July 14, 2015